Filed 9/17/25  P. v. Donato CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H050622 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. 21CR000956) |
| v. | |
| BALTAZAR OLIVERA DONATO, | |
| Defendant and Appellant. | |

After having been convicted twice before for drunk driving, defendant Baltazar Olivera Donato drove drunk and crashed head-on into another vehicle, killing one person and injuring another.  A jury convicted Donato of second degree murder (commonly referred to as a *Watson* murder (*People v. Watson* (1981) 30 Cal.3d 290 (*Watson*)), gross vehicular manslaughter while intoxicated, driving under the influence of alcohol and causing bodily injury, driving with a 0.08 percent blood alcohol content (BAC) causing injury, and driving on a suspended license.  The jury also found true several enhancement allegations.  The trial court sentenced Donato to 20 years to life in prison.

On appeal, Donato claims the trial court erred under the Fourth Amendment by denying his motion to suppress evidence obtained from a

warrantless blood draw.  Donato further claims the court erred by failing to instruct the jury on implied malice murder in accord with a decision issued by our high court after trial, *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*). Finally, Donato contends that the alleged errors were cumulatively prejudicial.

For the reasons explained below, we affirm the judgment.  Additionally. we order a correction to the clerk's minute order for Donato's sentencing hearing.

## I.  FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In May 2022, the Monterey County District Attorney filed an information charging Donato with the murder of Sabrina Theresa Lecce (Pen. Code,[1] § 187, subd. (a); count 1), gross vehicular manslaughter of Lecce while intoxicated (§ 191.5, subd. (a); count 2), driving under the influence of alcohol (DUI) and causing bodily injury to Lecce and Grisey C.G.[2] (Veh. Code, § 23153, subd. (a); count 3), driving with a 0.08 percent BAC causing injury to Lecce and Grisey (Veh. Code, § 23153, subd. (b); count 4), and misdemeanor driving when Donato's privilege was suspended due to a prior DUI conviction (Veh. Code, § 14601.2, subd. (a); count 5).

The information further alleged as to count 2, that Donato had sustained two prior DUI convictions (§ 191.5, subd. (d)) and, as to counts 3 and 4, that Donato had sustained two prior DUI convictions within the previous 10 years (Veh. Code, § 23566, subd. (a)), Donato personally inflicted great bodily injury (GBI) upon Lecce (§ 12022.7, subd. (a)), and the DUI

---

[1] All further unspecified statutory references are to the Penal Code.
[2] We refer to the surviving victim and the civilian witnesses by first name and last initials and subsequently by first name to protect their privacy interests.  (Cal. Rules of Court, rule 8.90(b)(4), (10).)

charges caused bodily injury and death to more than one victim (Veh. Code, § 23558).

Donato filed a motion to suppress blood test evidence obtained from a warrantless blood draw (§ 1538.5) (hereafter suppression motion). The district attorney opposed the suppression motion. Following a hearing held in July-August 2022, the trial court denied that motion.

In October 2022, the jury found Donato guilty as charged and found true all enhancement allegations.

In November 2022, the trial court sentenced Donato to a total prison term of 20 years to life, comprised of the following individual terms: 15 years to life on count 1; 15 years to life on count 2, stayed under section 654; the upper term of four years on count 3, enhanced by one year (Veh. Code, § 23558), consecutive to count 1; and the upper term of four years on count 4, enhanced by one year (Veh. Code, § 23558), stayed under section 654.[3] Additionally, the court sentenced Donato to time served on count 5 (a misdemeanor).

B. *Evidence Presented at Trial*

1. Prosecution Evidence

Around 7:00 p.m. on February 2, 2021,[4] Krisanta S. was driving southbound on U.S. Highway 101. Krisanta noticed a black four-door sedan ("maybe a Lincoln or a Cadillac") approaching her from behind "very, very quickly." After the car passed Krisanta, she observed that it being driven "very erratically," moving "from shoulder to shoulder" with erratic speed and no turn signal. The car eventually pulled onto the right shoulder and came to

---

[3] With the parties' agreement, the trial court did not impose any term for the GBI enhancements alleged under section 12022.7, subdivision (a). (See § 12022.7, subd. (g).)

[4] Unless otherwise indicated, all dates were in 2021.

a stop. Krisanta tried to get away from the car, but it reappeared in her rearview mirror "going so fast." Krisanta was "terrified." At 7:04 p.m., as Krisanta was passing the San Ardo exit, she called 911.

Around the same time, Lecce and her boyfriend Grisey were driving home on the freeway. Grisey was in the front passenger seat as Lecce drove her Mazda Protege southbound in the right lane near San Ardo. As Grisey was looking down at his phone, he heard Lecce gasp. Grisey looked up and saw headlights "coming directly at [them]." An oncoming black vehicle hit the driver's side of Lecce's car.

According to California Highway Patrol (CHP) Officer Robert Grindy (a certified accident reconstructionist), data retrieved by police from Donato's Lincoln revealed that 25 seconds before the collision, Donato's car was traveling 12 miles per hour. However, by the time of the collision with Lecce's car, Donato's car had accelerated and was traveling 83 miles per hour. Donato did not apply his brakes until between 0.2 and 0.01 seconds before the collision. An inspection of Donato's car failed to reveal any preexisting condition that would have caused the collision or affected the car's reliability on the freeway.

After Donato's car collided with Lecce's car, Grisey asked Lecce if she was okay. She did not respond. Grisey called 911 at 7:13 p.m. He noticed that Lecce was having trouble breathing and "was gurgling." Grisey sustained an injury to his right shoulder. When first responders arrived, they assisted Grisey out of the car and transported him to the hospital. Lecce died in her car at the scene due to multiple blunt force injuries.

4

CHP Officer Isaac Clocherty arrived at the scene of the collision at 7:28 p.m.[5]  It was dark when Clocherty arrived, and there were no streetlights in the area.  The weather was "clear, calm, cool."  Officer Clocherty observed fire and medical personnel attending to the occupants of Lecce's Mazda on the right shoulder/dirt embankment of the southbound lanes of Highway 101.  Clocherty also saw a black Lincoln MKS in the median north of the Mazda and facing east.  The Lincoln had damage indicating it was in "a major traffic collision."

Officer Clocherty approached the Lincoln's front passenger's side window and saw Donato seated in the driver's seat.  Donato looked at Clocherty, closed his eyes, and slumped over.  Clocherty moved around the car to the driver's side "where there [was] no more window."  Clocherty "immediately smelled the odor of an alcoholic beverage emitting from within the passenger compartment of the vehicle" and "emitting from [Donato's] breath and his person."  The odor coming from Donato was "[e]xtremely strong."  Donato also had "red, watery eyes" and a "lethargic appearance on his face."  He "appeared to be extremely intoxicated."  Clocherty asked Donato if he had had anything to drink.  Donato responded, " 'A lot.' "  Donato's "speech was thick and slurred."

Officer Clocherty noticed Donato trying to hide an open beer can (a 25-ounce Budweiser) underneath his driver's seat.  When Clocherty asked Donato what had happened, Donato "was less than forthcoming.  He was cursing and upset."  Because of Donato's "[b]elligerent" demeanor, injuries, and level of intoxication, Clocherty was unable to ask Donato the usual "pre-field sobriety test questions."

---

[5] At trial, the prosecution admitted footage from Officer Clocherty's body-worn camera.

Donato did not assist first responders in their efforts to extract him from his car and did not appear willing to exit the vehicle. Officer Clocherty was unable to open the vehicle's doors. Eventually, fire personnel pried open the front passenger's side door and assisted Donato out of the car. Clocherty observed blood on Donato's hands, legs, and upper body. Consistent with the information on Donato's identification card, Donato appeared to be about five feet six inches tall and 230 pounds. Clocherty arrested Donato for DUI. Thereafter, fire personnel told Clocherty that Lecce had died.

Officer Clocherty walked over to Lecce's car to survey the situation while Donato was being loaded into an ambulance. Based on his observations, Clocherty believed Donato's car had been traveling northbound in the southbound lanes of Highway 101 when it collided with Lecce's car "head on, driver side to driver side." Clocherty also believed Donato's car slid, flipped over, and came to a rest in the median. Clocherty opined that the cause of the collision was Donato driving under the influence of an alcoholic beverage and in the wrong direction on the freeway.

Emergency medical personnel transported Donato to a hospital in Salinas. Officer Clocherty left the scene of the collision around 8:10 p.m. He caught up to and followed the ambulance to the hospital, arriving there at 9:15 p.m. Clocherty brought a Department of Justice (DOJ) blood draw kit from his patrol vehicle into the hospital. He went to the area where Donato was being treated and began filling out paperwork. Donato was "in and out of consciousness." He would not answer questions and "was lethargic, laying there. He "had to be stimulated" for any questioning. Clocherty checked the two vials in the blood draw kit and confirmed that they were not expired.

At 9:45 p.m., a hospital phlebotomist drew two vials of blood from Donato's arm, following standard blood draw procedures. The phlebotomist

6

and Officer Clocherty verified that the vials were not expired. The phlebotomist used a 10 cc syringe and "butterfly needle" to obtain Donato's blood because he was "somewhat combative." After the phlebotomist filled out attendant paperwork, she gave the two vials of Donato's blood to Clocherty. Clocherty maintained custody of the vials until he arrived at his CHP office in King City around 2:00 a.m. the following morning (February 3). Clocherty placed the vials in an unrefrigerated evidence locker, pending transmittal by the evidence officer to the DOJ.

DOJ senior criminalist Laura Lee testified as an expert in forensic alcohol analysis and impairment. Lee explained that Donato's blood samples had been unrefrigerated until they arrived at the DOJ lab on February 10. Nevertheless, the preservative in the vials (sodium fluoride) could maintain the alcohol content of the blood at normal room temperature.

On February 23, Lee tested Donato's blood using the "head space gas chromatograph flame ionization detector method." This method is approved by the State of California, under title 17, for forensic alcohol analysis. The test revealed that Donato's blood contained a BAC of "0.193, plus or minus 0.009 percent weight per volume alcohol." That result "is the average of the two numbers that [Lee] got from both of [Donato's] samples."

Lee estimated that it would take a male with normal physiology weighing 230 pounds approximately 14 standard drinks to reach a 0.19 percent BAC. Lee explained how alcohol is primarily eliminated from a person's body through metabolism in the liver, which usually occurs at a rate of 0.01 to 0.025 percent per hour (but that estimate can vary depending on the person). Lee further explained that the more alcohol a person consumes, the more impaired the person will become, including with respect to driving. Lee opined that at a 0.08 percent BAC, "pretty much everybody is going to be

impaired, for the purposes of driving." Alcohol causes mental impairment and physical impairment. Mental impairment typically begins when a person's BAC is between 0.01 percent and 0.025 percent. Mental impairment lowers a person's inhibitions, increases risk-taking behaviors, impairs the ability to perform divided attention tasks, and causes the person to have slower reaction times. "[A]ll of those things can potentially affect [a person's] ability to drive safely." Lee further explained that physical impairment resulting from alcohol impairment occurs in two stages. Small muscle impairment typically sets in anywhere between a 0.05 percent and 0.10 percent BAC. Large muscle impairment usually occurs at 0.10 percent BAC or higher.

When presented with a hypothetical situation mirroring the circumstances of the instant case, Lee opined that the symptoms and driving pattern described were consistent with a person being impaired by alcohol.

On cross-examination, Lee acknowledged that there are causes other than alcohol that result in a person having red and "bloodshot" watery eyes. Lee also acknowledged that the odor of alcohol emanating from a person is not necessarily indicative of the amount of alcohol consumed or the time at which the person consumed alcohol.

In rebuttal to the defense evidence, Lee testified that in a study she had reviewed, unrefrigerated blood samples that included sodium fluoride (an ethanol preservative) had no significant change in ethanol content over a 14-day period. Additionally, Lee explained that she did not note any circumstance regarding Donato's blood samples which she believed could have affected the result of her testing. The vials contained at least three milliliters of Donato's blood because Lee sent a portion of the blood sample to a private defense laboratory for additional analysis. Lee did not

8

subsequently receive any information about a discrepancy between her result and any that may have been obtained by the defense laboratory. Lee did not note the expiration date of the two vials, so either the expiration date "was covered [by a label], or it wasn't expired."

The prosecution presented evidence that Donato had two prior DUI convictions. The first conviction for DUI (as well as hit-and-run driving (Veh. Code, § 20002, subd. (a)) and driving without a license (Veh. Code, § 12500, subd. (a))) resulted from a jury trial in 2012 (Monterey County case No. MK089984A). Donato's second DUI conviction resulted from a guilty plea in December 2018 (Lincoln County, Idaho case No. CR32-18-00841). In the latter case, the court placed Donato on probation for 24 months with conditions, including that he "not operate a vehicle with any alcohol in [his] blood."

Additionally, the prosecution presented a recording and transcript of testimony by a DOJ criminalist at Donato's 2012 jury trial. The criminalist testified, inter alia, about alcohol's effect on a person's ability to drive and stated that two tests of Donato's breath revealed a 0.23 percent BAC. To reach that BAC (not "accounting for burn off"), Donato would have consumed 14.5 standard drinks.

### 2. Defense Evidence

Suzanne Perry, a phlebotomist and analytical chemist, testified as an expert for the defense. Perry stated that based on the hospital phlebotomist's testimony, the phlebotomist apparently underfilled one or both vials, which would cause an incorrect ratio for the two additives within the vials (an anticoagulant and a preservative/glycolytic inhibitor (sodium fluoride)) and potentially inaccurate test results. Perry explained that the preservative inhibits microbes in the blood sample from producing ethanol and has an

9

effectiveness period of approximately 24 hours. The records Perry reviewed did not include any documentation of the amount of blood present in the two vials sent to the DOJ lab for testing. Further, Donato's blood samples were unrefrigerated for eight days, which could result in degradation and the production of ethanol.

Regarding the hospital phlebotomist's use of a hand sanitizer containing alcohol prior to drawing Donato's blood, Perry opined that that behavior was not "best practices" because of possible cross-contamination of the blood sample. Perry further opined that single column gas chromatography is "not the gold standard" and said that the American Board of Forensic Toxicologists "demanded that the laboratories in California and around the United States must use, at a minimum, dual column chromatography, as of January 1, 2014."

When presented with a hypothetical scenario in which a single column gas chromatography method is used to test a blood sample in "otherwise perfect conditions," Perry opined that the accuracy and reliability of the result would be "dependent upon the nature of the sample" and could be compromised by the test tubes being underfilled, potential cross-contamination from an alcohol-based hand sanitizer, "outgassing," and lack of refrigeration.

In surrebuttal to the prosecution's rebuttal evidence, Perry explained that a proper forensic testing procedure includes taking actions necessary to verify a vial's expiration date.

## II. DISCUSSION

On appeal, Donato claims: (1) the trial court erred under the Fourth Amendment by denying his suppression motion; (2) the court erred by failing

10

to properly instruct the jury on implied malice murder under *Reyes*, *supra*, 14 Cal.5th 981; and (3) the alleged errors were cumulatively prejudicial.

We address Donato's claims in turn.

A. *Warrantless Blood Draw*

Donato contends the trial court prejudicially erred by denying his motion to suppress evidence regarding the warrantless blood draw based on exigent circumstances. He asserts the prosecution failed to prove that CHP had no time to get a warrant and the court's finding regarding exigency is not supported by substantial evidence. He additionally argues the good faith exception to the exclusionary rule does not apply because Officer Clocherty's failure to obtain a warrant was not objectively reasonable.

1. Additional Background

In his pretrial suppression motion, Donato contended that, based on "Officer Clocherty's multiple explanations for the warrantless blood draw, it is apparent that no exigent circumstances were present to sustain a circumvention of [Donato]'s Fourth Amendment right against unlawful search and seizure."

The district attorney opposed Donato's suppression motion, asserting that "the exigent circumstances in this case exempt the requirement of a warrant under the Fourth Amendment."[6]

---

[6] The district attorney did not argue in her opposition that the good faith exception to the exclusionary rule should apply to this case. However, when orally arguing the matter at a hearing on Donato's suppression motion, the prosecutor asserted "there was no bad faith on behalf of Officer Clocherty" when Clocherty concluded "there was an exigent circumstance that required him to preserve critical evidence."

11

a. Evidence Presented at the Suppression Hearing

At a pretrial hearing on the suppression motion, the prosecution presented Officer Clocherty's testimony. Clocherty testified that around 7:13 p.m. on February 2, he was dispatched to the scene of a traffic collision on U.S. Highway 101. He arrived there at 7:28 p.m. and observed a "chaotic scene," with fire and medical personnel attending to two victims in a vehicle on the right shoulder of the freeway. He also observed a black Lincoln MKS in the center median of the freeway. The two vehicles appeared to have been in a head-on collision.

Officer Clocherty approached the driver of the Lincoln (Donato) who was "trapped inside his vehicle." The doors of the vehicle "were jammed." Clocherty contacted Donato first from the front passenger's side window and then from the driver's side of his car. Clocherty noticed that Donato's eyes were "red and watery. He reeked of alcohol. He was very lethargic. His speech was thick and slurred."

Officer Clocherty asked Donato how much he had to drink, and Donato responded, " 'A lot.' " When Clocherty asked Donato for his name, he answered " 'nothing.' " Clocherty asked Donato for his name again, in Spanish, and Donato responded, " 'Nothing.' " Clocherty asked Donato what had happened. Donato responded, " 'What's up?' " and said " 'Fuck it.' " Clocherty asked Donato if there were any passengers in his car and Donato said there were not. Donato did not provide his identification or driver's license when Clocherty asked for it. Donato refused to tell Clocherty what had happened.

Fire personnel eventually removed the front passenger's side door of Donato's car and extracted him at 7:53 p.m. As Officer Clocherty assisted Donato out of his car, Donato said " 'Fuck you.' " Clocherty did not perform

12

any field sobriety tests given Donato's demeanor and because Donato had "major injuries," was "in and out of consciousness," and was "[v]ery lethargic." Clocherty did not believe it then would have been safe to perform field sobriety tests.

Officer Clocherty arrested Donato about a minute after he was removed from his vehicle. While Clocherty was at the scene, two CHP sergeants (McEwen and Wheeler) responded to the location to assist.[7] Fire personnel informed Clocherty that the driver of the other vehicle had been pronounced deceased. Emergency medical personnel transported the other vehicle's passenger to a hospital for treatment. Donato also was transported by ambulance to the hospital in Salinas at approximately 8:13 p.m. Clocherty followed the ambulance in his patrol car.[8] Clocherty explained that CHP policy prohibited an arresting officer — "for the most part" — from letting his "arrestee out of [his] sight." The travel time to the hospital in Salinas was approximately one hour, and Clocherty arrived at the hospital around 9:16 p.m.

Officer Clocherty explained that he is legally allowed to use his cell phone in the course of his duties. But he also explained: "The CHP policy is I'm not allowed to use my cell phone in a patrol vehicle while it's moving unless it's an emergency or I need to talk to a supervisor, and it's supposed to

---

[7] Sergeant Wheeler directed traffic through the area and executed traffic breaks. Only one other King City area CHP officer (Brown) was on duty with Officer Clocherty at the time of the collision. Officer Brown, however, did not respond to the scene because he "was already transporting three arrestees from the King City area office to the county jail."

[8] After Officer Clocherty left the scene of the collision, two off-duty officers and, later, some on-duty CHP officers arrived. Two of the officers who had come on patrol assisted in the investigation by obtaining measurements, completing sketch diagrams for the traffic collision report, conducting "scene management and impounding the vehicles for evidence."

13

be short, to the point." Clocherty answered "No" when asked by the prosecutor if "it would have been practical or even safe for [Clocherty] during that drive [to the hospital] to contact an on-call judge and provide an oral affidavit for a search warrant for blood while [Clocherty was] following behind the ambulance." Clocherty acknowledged (on cross-examination) that he might have used his cell phone at some point that night while driving his patrol car. He testified that he "[m]ost likely" called his wife to let her know that he would be home late.

After arriving at the hospital, Officer Clocherty observed that Donato was "injured, very lethargic, [and] in and out of consciousness." Hospital staff wheeled Donato into the emergency room and began treating him, including with an IV (to administer medication) and CAT scans.

Officer Clocherty "advised [Sergeant McEwen] of the situation and requested a warrantless blood draw due to the circumstances." Clocherty testified (on cross-examination) that he did not know exactly where he was when he relayed the circumstances to McEwen and asked for permission to conduct a warrantless blood draw, but this conversation occurred prior to the blood draw. Clocherty explained that his conversation with McEwen "might have been prior to arrival to the hospital or right at the hospital." Clocherty made the decision to conduct a warrantless blood draw "[r]elatively close [in time] to [him] arriving at the hospital or while in transit." Based on Donato's injuries and demeanor, the fact that Donato was in and out of consciousness, and Clocherty's training and experience, Clocherty decided a warrantless blood draw was necessary. The blood draw occurred at 9:45 p.m. (29 minutes after Donato arrived at the hospital and about two hours and 32 minutes after the collision). Clocherty never asked Donato for consent to the blood draw.

14

Officer Clocherty knew that blood alcohol "dissipates at point 02 an hour on an average." Clocherty was familiar with the process for obtaining an on-call blood draw warrant in Monterey County. He had obtained a blood draw warrant three times before in Monterey County and approximately seven times in San Luis Obispo County. To obtain a blood draw warrant "after hours" in Monterey County, Clocherty had to go to his office in King City, turn on his computer, start his report, draft a probable cause declaration, and detail his qualifications as an officer. Next, he had to contact the dispatch center, which in turn would contact the district attorney's office and provide Clocherty's contact information for the on-call district attorney. Clocherty then would have to wait for the on-call district attorney to contact him so that he could forward his paperwork to the district attorney. Once the district attorney had reviewed Clocherty's paperwork, if there were no corrections required, the district attorney would send the paperwork back to Clocherty. Clocherty next would contact the dispatch center and ask to be contacted by the on-call judge. The dispatcher would provide the on-call judge Clocherty's contact information and the judge would call Clocherty. During the phone call, the judge would administer an oath and rule on the warrant application. Clocherty estimated that from the time he would have reached his office in King City, the entire after-hours warrant process would have taken anywhere from an hour and one-half to two and one-half hours.

Although Officer Clocherty had a computer in his patrol vehicle, it did not function like a typical laptop computer. Clocherty was unable to prepare a written warrant while he was with Donato at the hospital. Clocherty would have had to leave Donato at the hospital for a couple of hours to prepare a written warrant at his office in King City, and leaving Donato unattended at

15

the hospital would have violated CHP policy. Clocherty further explained that he did not have a breath testing device with him at the hospital. His CHP office only had two breath testing devices. "Usually one stays at the office" (for use when suspects are brought into the office) and "a supervisor takes one out."

On cross-examination, Officer Clocherty testified that he could not recall whether he had "ever done a warrantless blood draw before" and he decided to confer with his supervisor "to make sure that all the boxes were checked and [they] were doing the right thing." Clocherty further explained that he began his CHP career before the United States Supreme Court decided *Missouri v. McNeely* (2013) 569 U.S. 141 (*McNeely*). Prior to *McNeely*, CHP officers were allowed to conduct warrantless blood draws without the suspect's consent. Following *McNeely*, one county in which Clocherty had worked (San Luis Obispo County) "streamlined their procedure to get a blood warrant pretty quickly. . . . But the process to get in contact with the district attorney and the judge[] does still take a lot of time." The instant case marked the first time Clocherty had conducted a warrantless blood draw post *McNeely*.

In his report on the collision, Officer Clocherty stated some reasons for his decision to seek a warrantless blood draw based on exigent circumstances. The reasons included that Clocherty was the only on-duty officer at scene of the collision. Clocherty testified that although there were on-duty sergeants at the collision scene, "[s]ergeants are supervisors. They are not to arrest people. They are not to author reports. They are not to investigate traffic collisions. They're to assist."

Additionally, Officer Clocherty made his decision to conduct a warrantless blood draw based on Donato's need for ongoing medical

treatment and injuries—including an apparent neck injury and the "blood throughout [Donato's] body"—which "were major enough that [Donato] had to spend at least five days in the hospital." Moreover, at the hospital, Clocherty observed that Donato "would go limp, eyes closed, laying there on a bed [while] being worked on by doctors. Occasionally they would try to arouse him and wake him or talk to him, he wouldn't respond or sometimes he would. [He went i]n and out of consciousness." Donato's communications with the nurses and medical staff were very short.

Upon the request of Donato's defense counsel, the trial court viewed a portion of the video recorded by Officer Clocherty's body-worn camera before ruling on the suppression motion. According to the court's description of the portion it viewed, the clip began when Donato was removed from the ambulance at the hospital and concluded at the time of a conversation about the areas on Donato's body from which his blood could be drawn.

b. Trial Court's Ruling on the Suppression Motion

After hearing argument from counsel for the parties, the trial court described the state of the law regarding warrantless blood draws and said the "question is whether under these facts of this case there was exigency. The court is going to find there was exigency."

The trial court explained that driving under the influence "is a very unique crime for two reasons. One, the danger it presents to the public, but also because evidence, specifically alcohol, dissipates within the body over a period of time." The court recited its understanding of the facts of this case, including the limited number of CHP officers available at the time of the collision, the effort and time it took to extract Donato from his car, Donato's "uncooperative" behavior, the CHP policy that obligated Officer Clocherty to maintain contact with an arrested person, and that Clocherty and Donato

17

arrived at the hospital at 9:16 p.m., two hours and three minutes after the 911 call about the collision.

The trial court further noted that Donato was placed "in a trauma room" where there were at least 10 people present at any time. The court explained that in this "very professional setting" the staff members were "providing medical care to [Donato and] attempting to get information." The court observed that Donato "may have been responding, but we can't hear that on the video. [¶] . . . [Clocherty] asked for blood, [and the medical staff] tell him not yet. They're saying we've got to focus on my guess is stabilizing [Donato], making sure he's okay before that happens." Clocherty waited away from the "commotion" until he was provided what he needed.

The trial court concluded its ruling, saying: "So in regards to exigency, we do look at the totality of the circumstances. I did look at the behavior of [Donato] at the scene. I looked at the behavior of [Donato] in the trauma room, the time involved in getting [Donato] out of the vehicle and up to [the hospital], the time involved in investigating the accident, the time involved according to the officer of obtaining a warrant, and the unique nature of driving under the influence. [¶] I do find those support an exigency here. Consequently, there is no Fourth Amendment violation. [¶] Assuming for the sake of argument that a reviewing court would disagree with my opinion, I do find the testimony of the officer to be credible. I do not find any bad faith. Contrary, I do find good faith on behalf of the officer. It was meaningful to me that this is the first time post *McNeely* the officer effectuated a forced blood draw. Even if there was a violation, the court could not feel that suppression of evidence would be warranted."

2. <u>Legal Principles</u>

Under Vehicle Code section 23153, subdivision (b), there is a "rebuttable presumption" that a driver "had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of driving the vehicle if the person had 0.08 percent or more, by weight, of alcohol in his or her blood at the time of the performance of a chemical test within three hours after driving."

"Drawing blood from a motorist to investigate a driving under the influence case is a search." (*People v. Alvarez* (2023) 98 Cal.App.5th 531, 543 (*Alvarez*).) The Fourth Amendment to the United States Constitution guarantees individuals the "right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[9] (U.S. Const., 4th Amend.) A defendant may move to suppress evidence on the ground that a warrantless search or seizure was unreasonable. (§ 1538.5, subds. (a)(1)(A).)

" ' "[I]t is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " [Citations.] "The burden is on the People to establish an exception applies [to the warrant requirement]." ' [Citation.] 'One important exception is for exigent circumstances. It applies when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is

_____

[9] "The California Constitution similarly protects the 'right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches.' (Cal. Const., art. I, § 13.) But under the so-called truth-in-evidence provision of the state Constitution, ' "issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards." ' " (*People v. McWilliams* (2023) 14 Cal.5th 429, 437, fn. 2.)

19

objectively reasonable." [Citation.] The exception enables law enforcement officers to handle "emergenc[ies]"—situations presenting a "compelling need for official action and no time to secure a warrant." ' " (*Alvarez*, *supra*, 98 Cal.App.5th at p. 543; see also *Mitchell v. Wisconsin* (2019) 588 U.S. 840, 849 (*Mitchell*).)

In *Schmerber v. California* (1966) 384 U.S. 757, "the United States Supreme Court concluded that exigent circumstances could justify a warrantless blood draw during a DUI investigation because BAC diminishes over time and officers may need time to investigate an accident scene or attend to other pressing needs. [Citation.] But, 'while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically. Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances.' " (*Alvarez*, *supra*, 98 Cal.App.5th at p. 543, quoting *McNeely*, *supra*, 569 U.S. at p. 156; see also *People v. Bolourchi* (2024) 103 Cal.App.5th 243, 258; *Birchfield v. North Dakota* (2016) 579 U.S. 438, 456–457.)

In *McNeely*, the Supreme Court explained, "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." (*McNeely*, *supra*, 569 U.S. at p. 152.)

"More recently, our high court again [in *Mitchell*] examined 'the important question . . . [of] what officers may do when a driver's unconsciousness (or stupor) eliminates any reasonable opportunity for [an

evidentiary grade] breath test.' [Citation.] In its plurality opinion,[10] the *Mitchell* court held that when a 'driver is unconscious and therefore cannot be given a breath test . . . the exigent-circumstances rule almost always permits a blood test without a warrant.' " (*Alvarez*, *supra*, 98 Cal.App.5th at p. 544.)

"However, the *Mitchell* court did not reverse *McNeely*'s rule that officers need a blood-draw warrant if one is practical to obtain. [Citation.] To be sure, *Mitchell* agreed advances in technology made warrants quick and easy to obtain, noting the delay in getting them has 'shrunk, but it has not disappeared. In the emergency scenarios created by unconscious drivers, forcing police to put off other tasks for even a relatively short period of time may have terrible collateral costs. That is just what it means for these situations to *be* emergencies.' " (*Alvarez*, *supra*, 98 Cal.App.5th at p. 544.)

Despite the absence of a per se rule, "[w]hen police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment." (*Mitchell*, *supra*, 588 U.S. at p. 857 (plur. opn. of Alito, J.).)

"So even if the constant dissipation of BAC evidence *alone* does not create an exigency, [citation], *Schmerber* shows that it does so when combined with other pressing needs." (*Mitchell*, *supra*, 588 U.S. at p. 854

---

[10] In his separate opinion concurring in the judgment, Justice Thomas reiterated his view that "every drunk-driving arrest" (*Mitchell*, *supra*, 588 U.S. at p. 857 (conc. opn. of Thomas, J.) " 'implicates the exigent-circumstances doctrine,' " (*ibid*.) allowing officers to conduct a warrantless blood draw in "every drunk-driving case" (*id*. at p. 861).

(plur. opn. of Alito, J.).) "Thus, exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." (*Ibid.*)

"[T]he exigent circumstances test involves a two-step inquiry:  first, factual questions as to what the officer knew or believed and what action he [or she] took in response; second, a legal question whether that action was reasonable under the circumstances.  [Citation.]  On appeal, a reviewing court must affirm the trial court's determinations of the factual questions if they are supported by substantial evidence, but must take the ultimate responsibility for deciding the legal question according to its independent judgment." (*People v. Duncan* (1986) 42 Cal.3d 91, 97.)

    3. <u>Analysis</u>

Substantial evidence supports the trial court's findings regarding the presence of exigent circumstances.

The suppression hearing evidence establishes that Officer Clocherty confronted a dark and "chaotic scene" on a major freeway that included three severely injured persons, all of whom needed immediate attention.  Arriving about 15 minutes after the crash, Officer Clocherty saw that Donato was "trapped" inside his car and tried unsuccessfully to help Donato get out of his badly damaged vehicle.  Emergency personnel eventually extracted Donato 40 minutes after the collision.  At that point, Donato was going "in and out of consciousness," and Clocherty judged that field sobriety testing was not feasible under the circumstances.  In addition, Donato had "major injuries" that required transportation to a hospital about an hour away in Salinas.  Throughout this extended postcollision period, the alcohol in Donato's bloodstream was naturally dissipating.

The prosecution's evidence further showed that Officer Clocherty was the person tasked with investigating this deadly collision and the sole nonsupervisory CHP officer at the scene, at least until the time Donato was transported to the hospital one hour after the crash. The limited availability of responsive CHP personnel, the CHP's policies requiring its officers to maintain contact with their arrestees and limit their cell phone use while driving, and the protracted process for obtaining an after-hours warrant in Monterey County combined to constrain Officer Clocherty's capacity to seek a warrant in a timely fashion following the collision. Additionally, at the hospital, Donato continued going in and out of consciousness and was receiving intravenous fluids so that medical personnel could administer medications. Donato's injuries were severe enough to cause his days-long hospitalization and precluded Clocherty from taking Donato to the King City CHP office for an evidentiary breath test. Under these circumstances, a police officer could reasonably have believed that neither a breath test nor valid consent from Donato for a blood draw was feasible. The officer also could reasonably believe that he had to act quickly to minimize possible effects of the ongoing medical interventions on Donato's blood sample (see *Mitchell*, *supra*, 588 U.S. at p. 855 (plur. opn. of Alito, J.)) and obtain potentially vital evidence concerning the fatal collision before the passage of the three-hour timeframe set forth in Vehicle Code section 23153, subdivision (b).

We are not persuaded by Donato's reliance on *People v. Meza* (2108) 23 Cal.App.5th 604 in arguing that the trial court erred in denying the suppression motion. *Meza* is distinguishable from the instant case based on the conduct of the law enforcement officers involved. In contrast to the law enforcement officers in *Meza* who did not (and apparently could have) "used

23

diligent efforts to prepare and submit a brief warrant application" (*id*. at p. 612), Officer Clocherty was the sole nonsupervisory officer who could respond to the scene before Donato was taken to the hospital an hour after the collision. Clocherty also was the main investigator who possessed firsthand information about the collision scene and Donato's apparent inebriation and postcrash conduct, but he could not practically or safely relay that information to his colleagues or a judge while following the ambulance to the hospital. In short, Clocherty was actively and urgently carrying out his responsibilities and following department policies from the time he arrived at the scene until he reached the hospital with Donato more than two hours after the collision.

"Circumstances are exigent when blood alcohol evidence is dissipating, as it always is, and a pressing health, safety, or law enforcement need takes priority over a warrant application." (*People v. Nault* (2021) 72 Cal.App.5th 1144, 1148.) Substantial evidence supports the trial court's findings regarding the pressing needs surrounding this collision and its aftermath. Given the totality of the circumstances, we conclude that drawing Donato's blood without a warrant as he received treatment at the hospital more than two and one-half hours after the deadly collision was objectively reasonable based on the extant exigent circumstances.[11]

B. *Implied Malice Instruction*

At Donato's October 2022 trial, the trial court instructed the jury on implied malice murder with CALCRIM No. 520 (CALCRIM 520). On appeal, Donato contends that in *Reyes*, *supra*, 14 Cal.5th 981 (decided June 29, 2023),

---

[11] Because we affirm the trial court's denial of Donato's suppression motion based on exigency, we need not consider whether the good faith exception to the exclusionary rule should apply to this case.

our Supreme Court "clarified the standard for implied malice murder" such that "a defendant can only be found guilty of implied malice murder if the jury finds that he or she committed an act that involved a high degree of probability of death and knew the act entailed that danger." In turn, Donato argues that because the jury "was not instructed that it had to find that [his] drunk driving involved a high probability that it will result in death or that [he] knew his drunk driving entailed this danger when he drove," the instructions violated his constitutional rights to a jury determination of all facts required to convict him of murder and a conviction based on proof beyond a reasonable doubt. Additionally, Donato contends the instructional error was prejudicial under any standard of prejudice.

The Attorney General responds that Donato forfeited his current claim of error by failing to object to the implied malice instruction or otherwise request a modification of that instruction. The Attorney General further contends there was no instructional error because "*Reyes* did not substantively change the elements required to convict a defendant of implied malice murder." Lastly, the Attorney General asserts that any such error in the instruction was harmless beyond a reasonable doubt.

    1. Additional Background

The trial court instructed Donato's jury on implied malice murder using the then-current version of CALCRIM 520. The instruction provided, in part: "The defendant had *implied malice* if: [¶] 1. He intentionally committed the act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life."

25

During closing argument, the prosecutor asserted that the first element of implied malice was satisfied because Donato "intentionally drove" his car. As to the remaining elements, the prosecutor argued, "If you drive down the highway going the wrong way, speeding, drunk, failing to break, driving erratically, a natural and probable consequence is that you're going to get in a traffic collision. . . . [¶] At the time he acted, he knew his act was dangerous to human life." The prosecutor relied on Donato's prior DUI convictions as proof of his knowledge that the act of driving drunk was dangerous to human life and that he deliberately acted with conscious disregard for human life.

In summary, the prosecutor asserted that Donato drank about 14 drinks and "made the choice to get behind the wheel. He acted with such little regard for human life that he brought a beer with him. A person with two DUI convictions, who'd been told not to drive, who'd been told not to drive with alcohol in his system, who had previously been involved in a collision while drunk, got behind the wheel and drove. When he got behind the wheel and pressed that gas pedal, that was no different than pulling the trigger . . .. And that is why I'll be asking you to find [Donato] guilty of murder."

The prosecutor concluded her closing argument saying, "The death of 23-year-old Sabrina Lecce was entirely preventable. She died, not because of her own choices, but because of the choices of the [d]efendant, Baltazar Donato, because of his conscious disregard for human life."

Donato's defense counsel acknowledged in closing argument that implied malice "is one of the overriding issues in this case." Counsel questioned whether the evidence proved that Donato deliberately acted with conscious disregard for human life and argued the evidence showed Donato's "lack of consciousness."

26

In rebuttal argument, the prosecutor challenged defense counsel's argument for acquittal, noting that "unconsciousness may not be based on voluntary intoxication." The prosecutor continued, "You can't get so drunk that you're driving down the road, don't know where you're going, don't know what's going on, and, then, you cause a collision and, then, say, 'Well, I was unconscious.' The unconsciousness must be based on something else, and there is no evidence that anything else was causing [Donato] to be unconscious." The prosecutor further recounted the way in which Donato drove his car on the freeway that evening.[12]

2. Legal Principles

a. Implied Malice Murder

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Such malice "may be express or implied." (§ 188, subd. (a).) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Id.*, subd. (a)(2).)

"Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his [or her] conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes, supra*, 14 Cal.5th at p. 988, quoting *People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).) Thus, "implied-malice murder has a physical component: an act whose natural consequences are dangerous to life. And it has a mental component:

---

[12] In final jury instructions delivered after the closing arguments, the trial court told the jurors that "[v]oluntary intoxication does not negate the capacity to form the mental states of implied malice or conscious disregard for human life."

defendant's deliberate performance of the act with conscious disregard for life, knowing the act endangers another's life." (*In re Ferrell* (2023) 14 Cal.5th 593, 604 (*Ferrell*); see also *Reyes, supra,* 14 Cal.5th at p. 991 [" 'In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act.' "]; *People v. Soto* (2018) 4 Cal.5th 968, 974 [describing the physical and mental components of implied malice].)

In earlier implied malice murder jurisprudence, the California Supreme Court described the test for the physical component in two ways. First, in a concurring opinion, Justice Traynor stated that implied malice may be shown when the defendant does "an act that involves a high degree of probability that it will result in death." (*People v. Thomas* (1953) 41 Cal.2d 470, 480 (conc. opn. of Traynor, J.); see also *Knoller, supra,* 41 Cal.4th at p. 157 [" 'high probability of death' is the *objective*, not the *subjective*, component of the *Thomas* test"].) Later, our high court described the physical component as " 'an act, the natural consequences of which are dangerous to life.' " (*People v. Phillips* (1966) 64 Cal.2d 574, 587, overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12 (*Flood*).)

In *Knoller*, our Supreme Court explained that the *Watson* court had "held that these two definitions of implied malice in essence articulated the same standard." (*Knoller, supra,* 41 Cal.4th at p. 152, citing *Watson, supra,* 30 Cal.3d at p. 300; see also *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1218–1219.) The *Watson* court stated that implied malice murder "has been committed when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " . . ..' [Citations.] *Phrased in a different way*, malice may be implied when

defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*Watson*, at p. 300, italics added.)

"[T]he mental component of implied malice . . . requires a defendant to act with a conscious disregard for life, knowing his act endangers another's life." (*Ferrell*, *supra*, 14 Cal.5th at p. 597.) "The mental component calls for a subjective inquiry into a defendant's state of mind and requires 'a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard.' " (*Id.* at p. 604.)

"[M]alice may be implied when a person drives a motor vehicle under the influence of alcohol and kills someone." (*People v. Lagunas* (2023) 97 Cal.App.5th 996, 1005; *Watson, supra*, 30 Cal.3d at pp. 300–301.) "Since *Watson*, appellate courts have upheld numerous murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol. [Citations.] These opinions have generally relied on some or all of the factors that were present in *Watson*: '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' [Citation.] However, 'courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach.' " (*People v. Suazo* (2023) 95 Cal.App.5th 681, 692–693; accord *Lagunas*, at p. 1005.)

b. Jury Instruction Requirements and Standard of Review

" 'The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense.' " (*People v. Howard* (2024) 104 Cal.App.5th 625, 660 (*Howard*).) "Nevertheless, '[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a

29

request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal.' " (*Ibid.*; see also *People v. Hudson* (2006) 38 Cal.4th 1002, 1012–1013 (*Hudson*).)

" ' 'A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law." ' [Citation.] ' "The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " [Citation.] "We of course presume 'that jurors understand and follow the court's instructions.' " ' " (*Howard, supra*, 104 Cal.App.5th at p. 661.)

If a trial court incorrectly instructs on an element of a charged offense, the applicable standard of prejudice is the *Chapman* standard. (*Neder v. United States* (1999) 527 U.S. 1, 9–10.) Under the *Chapman* standard, a federal constitutional error requires reversal unless the People show the error was "harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24; see also *Flood, supra*, 18 Cal.4th at p. 475.)

3. Analysis

Beginning with the threshold issue of forfeiture, because Donato asserts that the trial court gave an instruction that is an incorrect statement of the law and the error affected his substantial rights (§ 1259), we will consider the merits of Donato's claim despite his failure to object or request a modification of CALCRIM 520 in the trial court. (See *People v. Thomas* (2023) 14 Cal.5th 327, 382; *People v. Gomez* (2018) 6 Cal.5th 243, 312; *Hudson, supra*, 38 Cal.4th at p. 1012; see also *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604.)

### a. Actus Reus/Objective Component

Regarding the objective component of the implied malice instruction, Donato contends "*Reyes* held that more is required than an act that is dangerous to human life [(as the trial court instructed here)]. The act must have a high degree of probability that it will result in death."[13] Donato acknowledges that "drunk driving is a dangerous act," but he asserts that "it does not involve a high probability of resulting in death." He similarly claims that his "act of drunk driving carried either a remote or a low probability of death" and his jury was erroneously "allowed to convict [him] of murder even when it found his drunk driving carried some lesser probability (remote, low, medium) than a high probability of resulting in death."

We are not persuaded that the trial court erred by failing to instruct that Donato's act must involve a high degree of probability that it would result in death.

In *Reyes*, our Supreme Court neither modified the legal definition of implied malice murder nor overruled long-standing precedent that the *Thomas* and *Phillips* decisions articulate the same standard for implied malice murder. Rather, the *Reyes* court reviewed the defendant's petition for resentencing under section 1172.6 and decided there was insufficient evidence to support the conclusion that defendant was guilty of implied malice murder as a direct perpetrator. (*Reyes*, *supra*, 14 Cal.5th at p. 989.)

---

[13] Donato notes that in March 2024, based on *Reyes*, the Judicial Council of California modified the second element of implied malice in CALCRIM 520 to include the following italicized language: "The natural and probable consequences of the (act/ [or] failure to act) were dangerous to human life *in that the (act / [or] failure to act) involved a high degree of probability that it would result in death.*" (CALCRIM 520 (March 2024 rev.), italics added; see also *People v. Collins* (2025) 17 Cal.5th 293, 306, fn. 3 (*Collins*).)

The court decided that the defendant's conduct in traveling to rival gang territory with other gang members was "merely . . . dangerous to life *in [a] vague or speculative sense*" (*ibid*., italics added) and did "not by itself give rise to a high degree of probability that death will result." (*Ibid*.) The court did not state that the " 'dangerous to human life' " (*id*. at p. 991) standard was itself vague or speculative, only that the facts proffered to support such a finding were vague and speculative and, thus, insufficient to meet the existing standard. (*Id*. at p. 990.)

By citing *Knoller*, the *Reyes* court reiterated the long-held precedent that "under the objective component of implied malice, ' " 'dangerous to life' " ' *means the same thing as* a ' "high degree of probability that" ' the act in question ' "will result in death." ' " (*Reyes*, *supra*, 14 Cal.5th at p. 989, quoting *Knoller*, *supra*, 41 Cal.4th at p. 152, italics added.) The *Reyes* court neither overturned nor otherwise questioned its prior decisions in which it held that "dangerous to life" and "high degree of probability" state the same standard, such as in *Watson*, *Dellinger*, *Nieto Benitez*, and *Knoller*.

In *Reyes*, the Supreme Court neither criticized nor suggested any modifications to CALCRIM 520. In its sole reference to the instruction, the court stated only that CALCRIM 520 "alone . . . does not encompass the elements of *aiding and abetting* implied malice murder as set out in [*People v.*] *Powell* [(2021) 63 Cal.App.5th 689]." (*Reyes*, *supra*, 14 Cal.5th at p. 991, italics added.) Further, " '[j]ury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent. They should not be cited as authority for legal principles.' " (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1157, fn. 7; see *People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.)

We conclude the trial court properly instructed Donato's jury on the objective component of the implied malice using the then-current version of CALCRIM 520, which remains a correct statement of the law notwithstanding *Reyes*.

### b. Mens Rea/Subjective Component

"For malice to be implied, a defendant must be subjectively aware that their acts or omissions endangered the life of" the victim. (*Collins*, *supra*, 17 Cal.5th at p. 321.) After *Reyes*, the Judicial Council did not change CALCRIM 520's language regarding implied malice's subjective knowledge component. As currently worded, CALCRIM 520 still instructs that, to satisfy the mental component of implied malice murder, the prosecution must demonstrate that the defendant knew the act he or she committed was "dangerous to human life." (CALCRIM 520 (March 2024 rev.).)

Donato contends that "*Reyes*'s definition of 'dangerous to human life' applies to both the objective and subjective elements using the same nomenclature." We are not persuaded by that contention.

The California Supreme Court has long distinguished between the actus reus and mens rea components of implied malice murder by emphasizing that the former is an objective standard and the later a subjective one. (*Knoller*, *supra*, 41 Cal.4th at p. 157; see also *Collins*, *supra*, 17 Cal.5th at p. 322, citing *Reyes*, *supra*, 14 Cal.5th at p. 989.)

In *Knoller*, our Supreme Court rejected an argument akin to the one Donato advances in this appeal regarding the subjective component of implied malice murder. The trial court in *Knoller* granted a new trial to a defendant who had been convicted of second degree murder on an implied malice theory. The trial court based its ruling on a finding of insufficient evidence that the defendant subjectively knew "her conduct involved *a high*

33

*probability of resulting in the death of another.*" (*Knoller*, *supra*, 41 Cal.4th at p. 142.) The Supreme Court ruled that the trial court had erred in granting a new trial on this basis because subjective knowledge of the high probability of death is not an element of implied malice. (*Id.* at p. 157.) The court reasoned that " 'high probability of death' " is part of the objective component of implied malice, not the subjective component. (*Ibid.*)

As discussed *ante* (pt. II.B.3.a.), the California Supreme Court's decision in *Reyes* did not overrule *Knoller*. Indeed, after *Reyes*, the court characterized the " ' " 'high degree of probability that [the act] will result in death' " ' element" as "objective." (*Collins*, *supra*, 17 Cal.5th at p. 322.) We therefore decide the trial court did not err in its instruction on the mental component of implied malice murder.

C. *Cumulative Prejudice*

Having concluded *ante* that Donato's claims of error are without merit, we in turn reject his claim of cumulative prejudice resulting from the asserted errors. There is no prejudicial error to cumulate. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

D. *Correction to Sentencing Minute Order*

Although not raised by the parties, the clerk's sentencing minute order (dated November 30, 2022) does not include the time-served sentence imposed by the trial court on count 5 for misdemeanor driving when that privilege was suspended (Veh. Code, § 14601.2, subd. (a)). We thus direct the trial court to amend the sentencing minute order to reflect that sentence.

### III.  DISPOSITION

The judgment is affirmed. The trial court is directed to amend the sentencing minute order to reflect the sentence of credit for time served

imposed on count 5 for misdemeanor driving when that privilege was suspended (Veh. Code, § 14601.2, subd. (a)).

_____
Danner, J.

WE CONCUR:



_____
Greenwood, P. J.



_____
Bromberg, J.



**H050622**
*People v. Donato*